(No. 45815.—

LA SALLE NATIONAL BANK, Trustee, *et al.*, Appellees, v. THE CITY OF EVANSTON, Appellant.

*Opinion filed May 20, 1974.—Rehearing denied June 28, 1974.*

Jack M. Siegel, Corporation Counsel, of Evanston, for appellant.

Pedersen & Houpt, and Morgan, Lanoff, Cook & Madigan, both of Chicago (Richard V. Houpt, James K. Stucko and Samuel M. Lanoff, of counsel), for appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This appeal involves the propriety of a zoning classification on certain property located in the City of Evanston, defendant herein. Plaintiffs, La Salle National Bank, as trustee of the property, and James Investment Corporation (hereafter Corporation), as the sole beneficiary of the trust, filed an action in the circuit court of Cook County seeking declaratory and injunctive relief. The circuit court ruled that the present zoning of plaintiffs' property was invalid and further held that the Corporation might construct the multi-unit apartment building which they requested. The appellate court affirmed (*La Salle National Bank v. City of Evanston,* 10 Ill. App. 3d 158), and we granted leave to appeal. The primary question concerns whether plaintiffs presented sufficient evidence to permit the invalidation of the present zoning ordinance.

Plaintiffs' property is a vacant lot at 1746 Hinman Avenue consisting of 52,800 square feet. It is located at the southwest corner of Hinman and Clark Street in Evanston. In February, 1968, the Corporation and owners of the majority of property situated on the eastern side of the 1700 block of Hinman Avenue filed a petition to amend the municipal zoning ordinance. They sought to have both sides of the 1700 block of Hinman Avenue reclassified from R—1 (single-family-residence district prohibiting structures in excess of 35 feet in height) to R—7 (general-residence district allowing structural heights to 85 feet). A similar attempt had been unsuccessful in 1960.

It would appear from the record that extensive testimonial and documentary evidence was presented to the Evanston Zoning Amendment Committee in favor of as well as in opposition to the modification. Pertinent to this appeal was the testimony of Kenneth James, an officer of the Corporation, who disclosed plans to develop the property presently at issue by constructing a large luxury apartment building which would be 85 feet in height. The Committee found that "The characteristics

of the subject area itself, together with the higher intensity, nonsingle family residence uses which completely surround it, make the present R—1 Single-Family Residence District unreasonable. There are, however, other alternatives for rezoning the property which ought to be considered in addition to the R—7 General Residence District requested by the petitioners." It enumerated the chief arguments against the R—7 classification as Evanston's "policy objectives designed to discourage (a) increased residential density, (b) the encroachment of high rise buildings on existing single-family neighborhoods." The Committee, therefore, recommended that an R—5A (general-residence district permitting multi-family structures not in excess of 35 feet in height) be established for the Hinman Avenue properties because this zoning category would "(a) be much more compatible with the land use and zoning surrounding the west side of the street [Hinman] than is the existing R—1 Single-Family Residence District Zoning, and be compatible with land use and zoning surrounding the east side of the street, (b) reflect the existing character of the south portion of the west side of the street, the blocks to the north and northwest, [and] west side of the 1700 block of Judson Avenue, (c) take advantage of the value of the site to the City as a whole for the development of high quality housing, (d) provide a transition from the development and zoning on the west and southwest to the lower density uses to the southeast and east near the lakefront, (e) allow the same regulations to apply to both sides of the street, and (f) provide for redevelopment of the west side of the street and long range future redevelopment of the east side of the street which would be much more compatible with the remaining single family homes on the east side of the street." The Committee rejected reclassification of the west side of Hinman to R—7 and the east side to R—5A because it would be difficult to permanently implement less than an R—7 use on the east side of Hinman if the

higher density R—7 was granted to properties on the west side of the street. The Committee concluded that "rezoning the area to R—5A would allow a reasonable return on the land to the chief petitioner [Corporation] and would allow good advantage to be taken, for the benefit of the City as a whole, of the special features of the area, without the hazard of setting a dangerous precedent for encroachment of high rise apartments on single-family neighborhoods and on the lakefront."

The committee report was submitted to the Evanston city council after the Corporation filed objections thereto. The city council adopted the committee recommendation insofar as it suggested that the west side of the 1700 block of Hinman be rezoned to R—5A. Plaintiffs then commenced this action.

Various area photos and diagrams depicting the zoning classifications and building heights of structures in the vicinity of plaintiffs' property were part of the exhibits submitted to supplement the testimony presented in the circuit court. The property at issue is situated between the central business district of Evanston, which generally lies to the west and southwest, and park land to the east which abuts Lake Michigan. Much of the property located to the north of the subject site is owned by or related to the operation of Northwestern University.

The property on the east side of the 1700 block of Hinman that retained its R—1 classification consists of seven parcels of property on which are located one or more older structures which appear to be substantial in character and which reflect the attributes of their present zoning classification. On the southeast corner of Hinman and Clark directly across from the subject property is a large home owned by the Westminster Presbyterian Church which is used as a religious center. One family also resides at this location. The remainder of this block has six single-family homes, one with a coach house. On the west side of the 1700 block of Hinman, immediately south of

plaintiffs' property, is a single-family home with a coach house. Next to this structure is headquarters for a national fraternity whose operations are conducted in a 2½-story "colonial-style" building. At the corner is the University Club, which is a 3-story brick structure.

East of the 1700 block of Hinman is Judson Avenue. The east side of Judson has a triangular-shaped park located thereon. The west side of Judson consists of several houses comparable in structure to those located on the east side of Hinman. Two are used by the University, another is a sorority house. The remaining structure is a building of limited height and a more modern architectural design. It is owned by a Jewish organization. Further to the east of Judson is the lakefront and another park. The area herein described is an R—1 classification.

To the north of the subject property beyond Clark Street are many structures primarily owned by the University and used for administrative purposes. Most of the buildings are large houses which have been adapted for their present purpose. On the northeast corner of Hinman and Clark is a 2½-story building used by a medical group. Its design resembles that of the national fraternity head-quarters previously described. The northern area is zoned U—2 (university district). This classification would prohi-bit the heights of structures to exceed 35 feet with the exception that a school building might rise to 50 feet if, under certain circumstances, the side and rear yards were correspondingly increased. Student or faculty residences might also be constructed by the University in this area, although there was no evidence that this had been done.

West of the subject property is an alley which abuts a lot containing two older structures for single-family residence. South of this, the remainder of the block is occupied by a ground-level city parking lot. The property herein described is zoned R—7, as are properties located for one block further west. Beyond this point is the business district.

Commencing about one block southwest of plaintiffs' property is the business district. Several blocks from plaintiffs' land in this area is a new 20-story office building.

Directly south, the 1600 block of Hinman Avenue is zoned R—7, and it contains numerous older structures. Located on the west side of this block is a church, a 7-story apartment building consisting of 25 units, and a "court-like building" with 4 floors of apartments totaling 76 units. On the east side of this block are two buildings eight stories high. One is a hotel for elderly men and the other a home for elderly women. The remaining two structures are at the north end of this block. These consist of apartment buildings of substantially lesser height containing 9 and 18 units respectively. It would appear from the record that no structure on this block was 85 feet in height.

Beginning about one block in a southeasterly direction from the property at issue, and continuing as such to the lakefront, is a vast area which is zoned for R—1 use.

Kenneth James, vice president of the Corporation, testified that the property at issue had been purchased in 1952 for $50,000. At that time the land was improved by a "mansion" and coach house with two apartments. Rather than place the mansion in compliance with defendant's building code, it was torn down several years later. The coach-house facilities were rented for many years but it, too, was subsequently removed. James related the Corporation's desire to construct a 10-story apartment building on the property containing 114 units of varying sizes. There would be 84 indoor parking spaces and 30 in back of the building. The structure would rise to a height of 85 feet, and at that time the estimated cost of construction was $3,500,000. He explained that this construction was dependent upon an R—7 zoning use, which would permit a maximum height of 85 feet and allow 65% maximum ground coverage of the property,

although slightly less coverage was actually contemplated. The R—5A classification granted by defendant would permit construction of only a 3-story building consisting of 42 units. This zoning use would permit only 50% coverage.

George Kranenberg, a planning and zoning consultant, was called on behalf of plaintiffs. After describing the immediate area, he concluded that there existed a variety of uses within the vicinity. He said that an R—7 was the best use and this classification would be in accord with the property to the west and south that was also R—7. He based his opinion on the fact that to the north, west and south of the property greater density and height limits were permitted and that the property to the east was totally out of character to R—1 zoning due to certain deviations from the use normally attendant to an R—1 district. Moreover, he suggested that the construction of the 85-foot-high apartment building would have no deleterious effect upon the area and specifically upon houses on the east side of Hinman Avenue, for the harm to the latter, if any, had already occurred. He opined that the proper dividing line for the R—1 classification should be drawn one block south of plaintiffs' property.

On cross-examination Kranenberg conceded that an R—5A use was not incompatible with the property on the east side of Hinman, that this use was not detrimental to others permitted in the area and that the lakefront could properly be considered an open area. He agreed that it was generally a sound principle to decrease residential population densities as one proceeded away from the central business district and that an alley might properly demarcate different zoning areas. He adhered to his testimony in a prior case in which he had said "that as density increases the compatibility and relationship of dwelling units is lost; that the detriment increases in direct proportion to the density, and that density affects the number of people in an area, the traffic, the transportation, and all the public

utilities provided within the city, such as sewer, water, electricity and gas." (*Lapkus Builders, Inc. v. City of Chicago,* 30 Ill.2d 304, 308.) However, he attempted to explain that his statement in *Lapkus* was based on his examination of the proposed population density that would have occurred in *Lapkus,* and had no relationship to the present case. He then admitted that in this instance he had not computed this density in the immediate vicinity of plaintiffs' property.

James Wolfe, a real-estate broker, who also appraised property on occasion, testified for plaintiffs that R—7 was the proper use for their property. He said that this use would not result in depreciation to the surrounding property or cause adverse effects. He noted that property to the north (U—2 district) was not presently an area of single-family residences but rather one used by the University for offices and other institutional activities. He valued plaintiffs' land at $790,000 if it was zoned for R—7 use but only $300,000 if it retained the R—5A classification.

On cross-examination he testified that a three-story luxury apartment building was not as compatible or as elegant as one that could be constructed to the Corporation's specifications, although a strong demand for luxury units did exist. In the university district to the north he said that only one structure, a chapel, presently exceeded 35 feet in height.

Wayne F. Anderson, the city manager of Evanston, was called by plaintiffs as an adverse witness. (Ill. Rev. Stat. 1969, ch. 110, par. 60.) Primary inquiry was directed to his knowledge of any plan by defendant to develop the air rights over the parking lot which was zoned for R—7 use and located to the west directly across the alley from plaintiffs' lot. Anderson said that Evanston had acquired the property between 1960-1963. Several developers had apparently submitted proposals for the lot and other city-owned properties; however, usually just inquiries were

made concerning the property. He disclaimed knowledge of any current official interest or plans for development.

George Anton, an independent real-estate appraiser, whose testimonial experience in matters of this nature was limited to a prior zoning-board hearing, estimated the value of plaintiffs' land at $350,000 if the R—5A classification was upheld. He suggested that the value would be $1,000,000 if an R—7 use was permitted and the property developed as planned. He testified that the R—5A use was presently suitable and there would be a market for apartments constructed under R—5A specifications.

Defendant called Richard Carter, its director of planning. He described the area with reference to the height of the structures in the vicinity. To the south in the 1600 block of Hinman the nearest structure exceeding five stories in height was about a block in distance from the southern boundary of plaintiffs' lot. He was of the opinion that the best use of the property at issue was for a "townhouse multiple family development." He based his conclusion on the fact that the character of the neighborhood was evidenced by the single-family residences on the east side of Hinman opposite plaintiffs' tract and the structures in the university area to the north. He said that the R—5A use would be compatible to the height and density of these properties. Moreover, he expressed the desire of the City of Evanston to have a tapering effect for buildings in the business district to the lakefront. This would gradually grade down the building heights before reaching the level, open areas contiguous to the lake. He claimed that the Corporation's development plans would be detrimental to the area particularly on single-family residences situated on large lots whose owners should not be subject to rezoning speculation.

On cross-examination Carter adhered to the tapering concept beginning in the City's core which was being applied in this instance by effecting an R—5A use. He said his opinion would not be modified even to the extent that

an 85-foot building might be constructed on the city parking lot although no evidence was ever presented to support the assertion that a structure of this nature was contemplated. Moreover, this witness suggested that an alley might be a proper boundary for differing zoning districts. He further testified that the structures on the university property to the north (U—2 district) might in particular instances reach 50 feet in height, but due to other zoning limitations all the structures would have to be demolished and rebuilt in order to exceed 35 feet. He did not anticipate that any construction of this type would occur for at least a decade because the University had informed his department of its construction plans during this period.

Carter further testified that all the uses of the property sites on Judson, east of plaintiffs' tract, had been established between 1949 and 1952 with the Jewish organization and University. Defendant and the sorority had entered into a consent decree which, in part, provided that no exterior alterations would be made to the sorority house located on Judson. These events occurred prior to the enactment of the present Evanston zoning ordinance in 1960.

F. Gregory Opelka testified on behalf of defendant. This witness possessed extensive experience as a professional real-estate appraiser and he evaluated the single-family homes on Hinman at $40,000-$70,000. He said that the highest and best use of the subject property was under the R—5A classification because of the established character of the surrounding area and lower level of houses which it contained. The apartment complex constructed in accordance with an R—5A use would complement the present height of the surrounding structures which were 2- or 2½-story buildings. He asserted that the proposed 10-story building would lessen the sunlight to some of the structures on the opposite side of Hinman, result in a 5-10% devaluation of the homes as single-family residences

that are located directly across the street, drastically change the nature of the area by creating a less desirable residential environment and lead to conversion of remaining properties to other uses. He placed the value of plaintiffs' land at $300,000 for R—5A use and between $550,000 and $600,000 if an R—7 classification was granted.

In response to plaintiffs' inquiry he expressed the view that construction of a building over the city parking lot located west of the subject site would not adversely affect single-family houses east of plaintiffs' tract because these properties would be too far removed. He further criticized the Corporation's plan to provide one off-street parking space per apartment as insufficient because it was his experience that a greater amount of parking was needed.

Patrick O'Brien, an Evanston resident and director of a community organization, testified in opposition to the Corporation's proposed plan. He said that a building of the size contemplated would have a destructive impact on the area's character and would begin a trend leading to "a jungle of high-rises."

William S. Lawrence was called by defendant. The parties stipulated that he was an expert in matters pertaining to city zoning and planning. He defined the highest and best use of property as that which does not unduly affect adjoining or surrounding uses yet provides a reasonable financial profit. He was of the opinion that the R—5A classification would be proper because of the character and development of the neighborhood and such classification would be a reasonable transition between R—7 and R—1 zoning. Even though the area was utilized in various respects, particularly by the University, he said that these operations were carried out in structures which maintained their single-family characteristics. Moreover, the R—5A district would permit a structure of similar height to those of nearby buildings. He noted that new structures to the north and south of the subject property

had assumed a residential character in height and that a 10-story building would be vastly dissimilar, thereby changing the area's aesthetic character. It would further have an adverse effect on the area by casting shadows on nearby property and generally diluting the quality of living. He asserted that the area would not be affected by construction of a building under R—7 specifications on the site of the city parking lot.

Initially, we are confronted with defendant's contention that this action was premature, for plaintiffs had failed to exhaust their administrative remedies. (*Bright v. City of Evanston,* 10 Ill.2d 178.) Defendant concludes that the trial court erred in failing to grant its motion to dismiss on this ground. The argument is premised on the fact that the Evanston city council had never separately considered rezoning the subject property from R—5A to R—7 and, until such determination is made, plaintiffs may not commence litigation.

Under the circumstances of this case we find this contention to be without merit. It is clear that substantial evidence was presented to the Zoning Committee, including the Corporation's plan to construct a luxury 10-story structure upon the property. The Zoning Committee made extensive findings regarding reclassification of the entire 1700 block of Hinman to R—7 use. Its report to the Evanston city council was detailed and its recommendation specific. We conclude from the record before us that a further attempt to seek reclassification of the subject property to R—7 use would have been futile, thereby rendering the *Bright* doctrine inapplicable. *Cf. Van Laten v. City of Chicago,* 28 Ill.2d 157, 160; *County of Lake v. MacNeal,* 24 Ill.2d 253, 260.

Defendant asserts that it is attempting to maintain a reasonable density of multiple development on a tract of land which faces a substantial single-family development immediately across the street and to maintain a 3-story height limitation in an area characterized by buildings of

2½ stories or less. We understand plaintiffs' argument to be that the area consists of varying uses and is not predominantly single-family in nature. They argue that the public health, safety and welfare would not be adversely affected by the height and density of an R—7 use. Throughout much of plaintiffs' brief is woven the common thread that there exists a substantial loss in property value under the present R—5A classification. Thus they conclude that the R—5A use is arbitrary and unreasonable.

The law governing the disposition of contentions challenging zoning classifications has been set forth in numerous decisions. As stated in *Exchange National Bank of Chicago v. County of Cook*, 25 Ill.2d 434, 439-40, "It is always presumed, in an attack upon an ordinance, that the enactment is valid, and the burden of proving its invalidity falls upon the one who attacks the ordinance. (*Jacobson v. City of Evanston*, 10 Ill.2d 61.) Before a court will intervene it must be established by clear and convincing evidence that the ordinance, as applied to plaintiffs, is arbitrary and unreasonable and has no substantial relation to the public health, safety or welfare. These rules are based upon a recognition that zoning is primarily a legislative function, subject to court review only for the purpose of determining whether the power, as exercised, involves an undue invasion of private constitutional rights without a reasonable justification in relation to the public welfare. (*People ex rel. Joseph Lumber Co. v. City of Chicago*, 402 Ill. 321; *Morgan v. City of Chicago*, 370 Ill. 347.) Where it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a classification, the legislative judgment must be conclusive. (*Krom v. City of Elmhurst*, 8 Ill.2d 104.) In *La Salle Nat. Bank of Chicago v. Cook County*, 12 Ill.2d 40, we reviewed the considerations determining the validity of an ordinance as applied to a particular property and stated that 'among the facts which may be taken into consideration in determining the validity of an ordinance are the

following: (1) The existing uses and zoning of nearby property, [citing cases], (2) the extent to which property values are diminished by the particular zoning restrictions, [citing cases], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public, [citing cases], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner, [citing cases], (5) the suitability of the subject property for the zoned purposes [citing cases], and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property. [Citing cases.] ' " (See also *People of the Village of Cahokia v. Wright,* 57 Ill.2d 166.) The parties herein have cited decisions of this court and various appellate courts in support of their respective positions and they would appear to be in agreement that a determination must be made upon the particular facts of the present case. *First National Bank of Lake Forest v. County of Lake,* 7 Ill.2d 213, 225.

Evidence was presented to demonstrate that the single-family use was no longer the predominant characteristic of the area. The Zoning Committee report to the Evanston city council amply establishes this recognition in its recommendation for R–5A multi-family zoning. The record sustains the conclusion that the mere unsuitability of the site for R–1 zoning does not require the adoption of the opposite zoning extreme which plaintiffs advance.

While evidence of the possible loss of property values to the home owners of R–1 property on the east side of the 1700 block of Hinman if the Corporation's project is permitted to be constructed is in conflict, it is undisputed that the present value of plaintiffs' property will be substantially increased if an R–7 zoning classification is allowed. However, it is recognized that land zoned for a more intensive purpose normally provides an appreciation in property valuation. (*Jacobson v. City of Evanston,* 10

Ill.2d 61, 68; see also *Cosmopolitan National Bank of Chicago v. Village of Mount Prospect,* 22 Ill.2d 463, 470; *Bright v. City of Evanston,* 57 Ill. App. 2d 414, 432-33.) Here, the Corporation will realize a sixfold profit on the property if R—5A multi-family development is upheld while the financial gain will be even more enlarged if the most intensive multi-family luxury use is allowed. At the time the Corporation purchased this land in 1952 it was fully aware of the R—1 single-family use then permitted under the applicable zoning restriction, which we assume would render the value less than under the existing R—5A limitation. It has been noted that a contention as to loss of value is of diminished persuasion when a purchaser acquires land under circumstances similar to this case and then asserts the expectant loss resulting from the present zoning as a basis for his attack thereon. *Lapkus Builders, Inc. v. City of Chicago,* 30 Ill.2d 304, 310; see *Standard State Bank v. Village of Oak Lawn,* 29 Ill.2d 465, 470.

The parties herein do not suggest that plaintiffs' property is not suited for R—5A development. The uncontroverted testimony introduced supports the feasibility of such use.

A municipality may reasonably restrict increase of population density as necessary for its health, safety and welfare (*Lapkus Builders, Inc. v. City of Chicago,* 30 Ill.2d 304, 309; *Exchange National Bank of Chicago v. County of Cook,* 25 Ill.2d 434, 441) and in the present case Kranenberg was in agreement that as proximity to the central business district lessened, density could also properly decrease. There is no evidence that the structural height or residential density in the immediate vicinity is presently comparable to that envisioned in the Corporation's construction plans and this would include properties located on the 1600 block of Hinman.

Additionally related to the issue of excessive density is the evidence presented as to the impact that the Corporation's proposed development would have on present

zoning in the area. We find Opelka's testimony persuasive that an R—7 use would permit the transformation of remaining properties to other uses. It is possible to assume that this rezoning would be directed to an attempt to establish additional multi-family structures permitted under R—7 zoning with the correspondingly substantial increase in density. This inference is reasonably supported not only due to the action of the majority of property owners on the east side of the 1700 block of Hinman, who joined with the Corporation in an attempt to have the entire block rezoned to an R—7 use but is also reflected in the Zoning Committee report.

Plaintiffs have attempted to infer that construction of a building similar to that proposed may occur on the site of the city parking lot directly west of a portion of the subject land. There is no evidence to support this position other than the present R—7 zoning of the parking lot, and the same may be said as to future development in the U—2 area to the north. But even had plans for development of the parking lot to the full extent of R—7 zoning been introduced, we do not believe that this would be of controlling importance. Evidence tended to establish that such a building would not have significant impact on the houses on the east side of the 1700 block of Hinman or the surrounding area. Moreover, zoning boundaries must be drawn and the mere fact that property is adjacent to a district permitting less restricted use does not render the former's classification invalid. *Wesemann v. Village of La Grange Park,* 407 Ill. 81, 89; *Village of Belle Terre v. Boraas,* 416 U.S. 1, 8 n.5, 39 L. Ed. 2d 797, 804 n.5, 94 S. Ct. 1536, 1540 n.5.

Plaintiffs have relied upon the use variation of the immediately surrounding properties, but it is clear that present area usage does not approach the extent which plaintiffs seek in relation to height and density. While the present or immediate future usage would justify multi-family zoning, plaintiffs, at most, have merely established

that a reasonable disagreement exists as to the degree of multi-family use.

In addition to the aforementioned considerations, we note that there was substantial evidence that the building contemplated by the Corporation would be significantly dissimilar to any structure in the immediate vicinity and would alter the area's character. It would also disrupt the defendant's present attempts to have a gradual tapering of building heights toward an open lakefront and park area which could be used for recreational purposes. As was said in *Trust Co. of Chicago v. City of Chicago,* 408 Ill. 91, 100, "A zoning ordinance may not be based alone on aesthetic considerations [citation], although it is no objection to such an ordinance that it tends to promote an aesthetic purpose, if its reasonableness may be sustained on other grounds." Thus prior decisions of this court, while recognizing aesthetic elements, have not deemed them to be controlling in zoning cases. (*Chicago Park District v. Canfield,* 370 Ill. 447, 457.) The reason advanced for declining to afford aesthetic qualities significant import is that the subject does not lend itself to exact definition but varies as to personal taste. (*State Bank and Trust Co. v. Village of Wilmette,* 358 Ill. 311, 319; *Forbes v. Hubbard,* 348 Ill. 166, 181.) However, there would appear to be significant authority that aesthetic factors may, in some instances, be utilized as the sole basis to validate a zoning classification (*People v. Stover* (1963), 12 N.Y.2d 462, 240 N.Y.S.2d 734, 191 N.E.2d 272, and cases cited therein, *appeal dismissed,* 375 U.S. 42, 11 L. Ed. 2d 107, 84 S. Ct. 147; see generally Annot., 21 A.L.R.3d 1222 (1968); Leighty, Aesthetics as a Legal Basis for Environmental Control, 17 Wayne L. Rev. 1347, 1373-83) or be acknowledged as a viable factor in zoning determinations (*State ex rel. Stoyanoff v. Berkeley* (Mo. 1970), 458 S.W.2d 305, 310). We are of the opinion that in the present case aesthetic qualities are a properly cognizable feature and that the evidence presented is supportive of

defendant's position that the R—5A use is not arbitrary or unreasonable and is in accord with the general public welfare. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 6, 9, 39 L. Ed. 2d 797, 802, 804, 94 S. Ct. 1536, 1539, 1541.

After consideration of the aforementioned factors, we conclude that the appellate court and circuit court erred in granting judgment for plaintiffs and their decisions were contrary to the manifest weight of the evidence. Plaintiffs have failed to negate the presumption of validity attendant to the present R—5A zoning classification limiting the construction of luxury residential apartment units to one third the number planned by the Corporation.

Accordingly, the judgments of the appellate court and the circuit court of Cook County are reversed.

*Judgments reversed.*