JOHN PETERSON *et al.*, Plaintiffs-Appellants, v. THE CITY OF HIGHLAND PARK *et al.*, Defendants-Appellees.

Second District No. 2—86—0227

Opinion filed March 13, 1987.—Rehearing denied May 4, 1987.

Berle L. Schwartz and Andi C. Goldfien, both of Highland Park, for appellants.

Robert Y. Sperling and Synde B. Keywell, both of Katten, Muchin, Zavis, Pearl, Greenberger & Galler, of Chicago, for appellees.

JUSTICE HOPF delivered the opinion of the court:

This is an appeal from a judgment upholding a local zoning ordinance. Plaintiffs, John and Rita Peterson, seek to overturn an ordinance adopted by defendant, city of Highland Park, which granted a special use permit. Plaintiffs contend that the trial court erred in granting judgment for defendants because (1) the city had no authority to issue the subject special use permit, (2) defendant failed to follow its own special use permitting procedures, (3) the special use permit ordinance is unconstitutional because it is arbitrary and capricious, and (4) the trial court misinterpreted the city's zoning ordinance.

Defendant, Highland Park Hospital (hospital), is currently located on 22.6 acres of property in the city of Highland Park (city). It has been at its present location since 1918. In 1978 the city adopted a zoning ordinance which placed the hospital property in an RM-2 zoning district. An RM-2 district is intended to provide for high-density multiple-family residential uses. Hospitals may be located in RM-2 districts but only as special uses. Accordingly, since adoption of the zon-

ing ordinance in 1978, the hospital has continued to operate at its present site under a series of special use permits.

In June 1985, pursuant to zoning ordinance requirements, the hospital filed an application with the city for a special use permit to construct on its property a medical office building (MOB) with a weather-enclosed connection to the hospital. Peter Friend, the hospital's executive vice-president, appeared before the Highland Park Plan Commission (plan commission) on June 18, 1985, to discuss the three-story, 40,000-square-foot facility. On July 2, 1985, a public hearing was held before the plan commission. During the hearing, both the city's director of community development and representatives of the hospital made presentations, answered questions, and addressed the concerns expressed by commission members. A number of citizens also expressed their views and asked questions. The hospital project was further discussed at two succeeding plan commission meetings by commission members, local businessmen, hospital representatives, neighbors, and other city residents.

Subsequently, the plan commission prepared a document entitled "Findings of Fact" as required by the zoning ordinance. These findings, along with both a favorable recommendation on the MOB from the commission and a summary of the statements of opponents of the building, were presented to the Highland Park city council (city council) for council action.

The proposed MOB was discussed at the city council meetings of September 9, 1985, and October 7, 1985. On these occasions the city council allowed discussion by hospital representatives, plan commission members, and city residents. The ordinance granting a special use permit to the hospital for construction of the office building was enacted on October 11, 1985. The ordinance permitted construction of the MOB "accessory to the Hospital use."

Plaintiffs, John and Rita Peterson, filed a complaint for declaratory judgment and injunctive relief from the MOB ordinance on November 12, 1985. The Petersons are neighbors of the hospital. They own a home in which they live as well as the property next door to them. Their property line is located approximately 120 feet from the hospital property line but approximately 800 feet from the proposed MOB itself.

The Petersons' complaint alleged essentially the same defects in the ordinance and its passage that they raise on appeal, i.e., that it was passed without lawful authority and in violation of permitting procedures set forth in the zoning ordinance and that the ordinance is arbitrary and unreasonable. At trial plaintiffs' lawful-authority argu-

ment developed along two lines: (1) the city's zoning ordinance, on its face, prohibited the MOB on the hospital's property; and (2) defendants could not clothe the MOB special use ordinance with authority by characterizing the MOB as an accessory use or accessory building to the hospital.

At the close of plaintiffs' case during the bench trial of this matter, defendants moved for a directed verdict. The court's ruling on the motion dealt separately with the three issues raised by plaintiffs. Defendants' motion was granted as to the contentions that the city had violated its own zoning ordinance procedures and that the ordinance was unconstitutional. The motion was denied as to plaintiffs' claim that the city had improperly determined that the MOB was an accessory use.

At the end of the trial, the court held that the MOB was an accessory use to the hospital use of the subject property and entered judgment in favor of defendants and against plaintiffs. This appeal followed.

The first question we must answer is whether the trial court erred when it granted defendants' motion for directed verdict as to two of the issues raised by plaintiffs. Section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1110) provides that, in nonjury cases, a defendant may move for a finding or judgment in his favor after the close of plaintiff's case. In ruling on such a motion, the trial court must first determine, as a matter of law, whether the plaintiff has made out a *prima facie* case. If he has not, the motion should be granted and judgment entered in defendant's favor. (*Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154-55, 407 N.E.2d 43.) Where the plaintiff has made out a *prima facie* case, however, the trial court must consider all the evidence, including that which favors the defendant, determine the credibility of witnesses, draw reasonable inferences from the testimony, and consider the overall weight and quality of the evidence. (81 Ill. 2d 151, 154-55, 407 N.E.2d 43; Ill. Rev. Stat. 1985, ch. 110, par. 2—1110.) If the weighing process negates some of the evidence necessary to plaintiff's *prima facie* case, the defendant's motion should be granted. If the plaintiff's *prima facie* case remains established even after the weighing process, the motion must be denied, and the trial should continue. 81 Ill. 2d 151, 155, 407 N.E.2d 43.

In the case at bar, the trial court found that plaintiffs had not presented sufficient evidence to establish a *prima facie* case that defendants violated their own ordinance. Plaintiffs insist, however, that the city failed to follow its zoning ordinance in that the plan com-

mission did not make certain findings as required by the ordinance and purported to make other findings without any adequate evidentiary basis. We find plaintiffs' position to be unfounded.

Section 150.100 of the city's zoning ordinance is concerned with "Special Uses." The section details the purpose of the special use classification, the types of special use permits, and the requirements and procedure for issuance for a special use permit. Section 150.100.3 mandates that:

"No special use permit shall be recommended by the Plan Commission for approval by the City Council unless the Commission shall make the following findings about the proposed special use:

150.100.3.1 **Minimum Regulations.** It shall comply with not less than the minimum regulations of the district in which the proposed site is located.

150.100.3.2 **Public Welfare.** It shall be so designed, located, and proposed to be operated and maintained that the public health, safety, and welfare will not be endangered or detrimentally affected.

150.100.3.3 **Impact on Other Property.** It shall not substantially lessen or impede the suitability for permitted use and development of, or be injurious to the use and enjoyment of, or substantially diminish or impair the value of, or be incompatible with, other property in the immediate vicinity.

150.100.3.4 **Support Facilities.** It shall have or make provision for adequate utilities, access roads, drainage, and other necessary facilities.

150.100.3.5 **Parking and Traffic.** It shall have or make adequate provision for parking and ingress and egress and be so designed as to minimize traffic congestion and hazards in the public streets.

150.100.3.6 **Adequate Buffering.** It shall have adequate site area, which area may be greater than the minimum in the district in which the proposed site is located, and other buffering features to protect permitted uses or surrounding properties.

150.100.3.7 **Orderly Development.** It's [*sic*] establishment will not impede the normal and orderly development and improvement of the surrounding property for permitted uses.

150.100.3.8 **Performance.** There shall be reasonable assurance

that it will be completed and maintained if authorized.

150.100.3.9 Special Use Requirements. It shall comply with all applicable requirements in this ordinance for special uses."

The plan commission submitted to the city council a written document entitled "Findings of Fact" which is referenced to the public hearing held by the commission on this matter. That document specifically, and individually, addresses each of the nine categories listed above.

While plaintiffs do not dispute that the "Findings of Fact" were prepared by the plan commission, they argue that information contained in certain of the categories either does not amount to a finding at all or is not adequate to justify the finding or is not supported by the evidence that was available to the plan commission. However, our review of the findings·themselves, along with other relevant testimony and exhibits admitted during plaintiffs' case, persuades us that plaintiffs were not able to establish sufficiently that the city violated its own requirements for granting a special use permit to. withstand a motion for a directed verdict.

The evidence offered by plaintiffs particularly attacks the public welfare, impact on other property, parking and traffic, and orderly development findings made by the plan commission. Plaintiffs elicited testimony that the traffic analysis relied upon by the plan commission was inadequate and resulted in the commission's erroneous finding that the project was designed so as to minimize traffic congestion and hazards on the neighborhood streets. The increased traffic, according to the testimony, would have a significant negative impact on neighboring property as well as on the public welfare in general. It was also opined by plaintiffs' witnesses that allowing the MOB in the existing zoning district would impact negatively on residential neighbors because the facility would be a deviation from the existing pattern and result in a perception that the area had become unstable and subject to further change. The overall thrust of plaintiffs' case was to attack the sufficiency of the findings, or simply to disagree with the plan commission's conclusions. We have reviewed the findings themselves, however, and do not find them wanting.

The plan commission approach was to acknowledge that the MOB, as an accessory use of what was already a special use, would impact on its surrounding environment in a number of negative ways. The commission's findings set forth means for mitigating those impacts and stressed the value of the MOB to the broader community.

The findings of fact on public welfare indicate that the commission

perceived that the hospital, where it was located and as it was operated, had long provided a benefit, in the form of quality health care, to the community. It was the commission's belief that the MOB would enhance that health care. Accordingly, the commission concluded that the public welfare would not be detrimentally affected. As far as the category regarding impact on other property, the findings indicate that the hospital had cooperated with the city in geographically reorienting its development. While the hospital originally was oriented toward the east, it was now directing its growth, including the MOB, in a southerly direction. This was done precisely in order to ease specifically defined traffic problems and reduce the visual impact of development on the residential neighborhood. The findings further note that the MOB was designed in a "stepped" fashion to minimize its visual impact and be compatible with the neighborhood.

Under the parking and traffic finding, the commission reported that while the zoning ordinance required only 937 parking spaces for the hospital and MOB combined, the proposed site plan actually provided a total of 964 spaces. The commission acknowledged that certain streets would experience a significant increase in traffic due to the MOB. It was also noted, however, that the congestion and hazards resulting from the increased traffic might be minimized by widening a street and adding proper landscaping and improved signage. These steps would reduce the overall traffic impact on the immediate neighborhood.

Finally, the plan commission found, under the orderly development category that, in the highly competitive health services industry, the addition of the MOB was precisely the appropriate direction for the hospital to take in its own development on its own property. The findings also stressed the cooperative effort between the city and the hospital to utilize a master planning process in order to assure that the development of the hospital was compatible with the development of the community. The geographic reorientation of its expansion in a more desirable direction was cited as a result of that process. As noted above, the hospital's physical reorientation had also been perceived as an attempt to limit the negative impact of the MOB on surrounding property. Each of the other areas of required fact finding was similarly analyzed by the plan commission.

Comparing the evidence offered by plaintiffs with the written plan commission findings of fact, we fail to see how plaintiffs showed that the commission either made no findings or made inadequate findings of fact. Each and every category of findings set forth in the zoning ordinance was addressed and discussed. The commission explained

how the overall plan for the proposed MOB had been located, designed, and modified to meet the requirements established by each of those categories and did so by reference to specific facts. The findings of fact do not imply that the MOB, if built, would have *no* effect on the surrounding area. On the contrary, they candidly admit a negative traffic impact and at least impliedly acknowledge the possibility of other less than positive effects. But the overall purpose of requiring the findings, as revealed by the category descriptions themselves, is to ensure that a special use has as little detrimental effect as possible, and causes as little disruption as possible, to the uses permitted and already existing in the underlying zoning district. In other words, the zoning ordinance mandates that special uses be closely controlled in order to maintain the status quo, not perfectly, but to the greatest extent possible. The findings of fact before us adequately show that the plan commission gave· full consideration to the status quo of both the property in the immediate vicinity and the community as a whole.

■ As to plaintiffs' allegation that the findings of fact were not supported by the evidence, we do not believe this position is supported by the record. The plan commission received extensive testimony regarding the MOB, both favorable and unfavorable, at three separate public meetings. The commissioners heard testimony from several doctors that they could deliver better, more efficient health care to their patients, and make more effective use of their office hours, if their offices were adjacent to the hospital. Representatives of the hospital testified that the MOB was vital to its economic vitality as well as to the attraction of significant medical specialists to the hospital. The hospital's traffic consultant testified that traffic on certain streets would increase but also described how the plans for the building would change existing traffic patterns and channel the traffic flow in such a way as to mitigate the potential effect on the residential areas around the hospital. Finally, hospital representatives, and the hospital's consultants, described how they had tried to plan the hospital's growth in cooperation with the city and how the MOB, with its accompanying landscaping and buffering, was designed to minimize its impact on neighbors. Numerous exhibits put into evidence reveal that much of the technical information received at the public hearing was corroborated by the city's professional staff who advised the plan commission. On the basis of all the information available to the plan commission, both oral and written, we cannot say that their findings lacked an adequate evidentiary basis.

The other issue which fell to defendants' motion for a directed verdict was whether or not the special use ordinance was unconstitu-

tional. Plaintiffs argue that the special use permit for the MOB is void because it is arbitrary and capricious. The basis for plaintiffs' position is the evidence presented to the trial court that (1) the values of residential property surrounding the hospital would depreciate, (2) the ordinance represents a departure from the economic strategy embodied in the city's master plan, and (3) the ordinance undermines the existing, underlying residential zoning. Once again, we do not think plaintiffs' conclusion can be supported.

 Since the decision by a city of whether to grant a permit for a special use is an exercise of the legislative function, local lawmakers are not required to follow set standards in arriving at such decisions. However, their determination may be reviewed by the court and will be upheld only if it bears a substantial relationship to the public health, safety, or welfare. (*Swim Club of Rockford, Ltd. v. City of Rockford* (1985) 130 Ill. App. 3d 353, 358, 473 N.E.2d 1375.) As legislative action enjoys a presumption of validity, one seeking to void a zoning decision must show by clear and convincing evidence that the zoning provision, as applied to them, is arbitrary, unreasonable, and lacking the necessary relationship to the public welfare. (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428, 312 N.E.2d 625; *Swim Club of Rockford, Ltd. v. City of Rockford* (1985), 130 Ill. App. 3d 353, 358, 473 N.E.2d 1375.) Review of special use determinations must consider the traditional factors applied to zoning matters: the use and zoning of nearby property; the extent to which property values are diminished by the zoning provisions; the extent to which destruction or limitation of property values of plaintiffs promotes the public health, morals or general public welfare; the suitability of the subject parcel for the purposes permitted; relative gain to the public as opposed to hardship imposed on plaintiffs by the change in use. (*La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65.) Two additional factors to be considered are (1) the care with which the community has undertaken to plan its land use development, and (2) the evidence or lack thereof of community need for the proposed use. *Drogos v. Village of Bensenville* (1981), 100 Ill. App. 3d 48, 54, 426 N.E.2d 1276.

In the instant case, although the MOB would not be a residential use conforming to the RM-2 zoning, it would be compatible with the already existing special use, *i.e.*, the hospital. While plaintiffs presented evidence that the residential property value would be depressed by the MOB, other evidence admitted by the trial court indicated that every attempt would be made to minimize the negative effect of the project on plaintiffs' property. Moreover, there was considerable evi-

dence that the MOB would promote the general welfare of the public in the form of more efficient and more comprehensive health care. The evidence was, at best, inconclusive as to the need for more medical office space in the city. Local business operators expressed fear that the MOB would result in the overbuilding of medical office space and cause medical tenants to move away from the business area. On the other hand, there was evidence that the existing medical office space was almost completely filled and that many of the doctors interested in locating in the MOB were not currently located near the business district.

With regard to city planning for land use, there was both testimony and documentary evidence admitted during plaintiffs' case regarding the relationship between the proposed MOB and the city's master plan. That evidence indicates that the city had planned to concentrate medical offices close to the central business district in an attempt to generate customers for the shops located in the business district. Plaintiffs assert that allowing the MOB on the hospital's site contravenes the master plan and is unreasonable. While we acknowledge that the city's master plan appears to reflect an intent to limit the location of medical offices, the city's zoning ordinance states at section 150.003: "The Master Plan shall be advisory only and in and of itself shall not be construed or interpreted as regulating or controlling the use of any private property ***." The section further reserves for the city council the decisions as to whether and when to implement the master plan and indicates that such decisions are to be made in the context of what is best for the city as a whole. Thus, while the city may have gone through a planning process, the resulting plan is meant only to advise. The ultimate decision as to use of private property is for the legislative body.

The sum total of the evidence relevant to the factors used to evaluate a zoning provision reveals, more than anything else, a difference of opinion regarding the nature and degree of the benefits and burdens which might flow from the MOB. Where the question of the reasonableness of the zoning decision is fairly debatable, the courts will not interfere with the legislative judgment. *La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428, 312 N.E.2d 625; *Cech Builders, Inc. v. Village of Westmont* (1983), 118 Ill. App. 3d 828, 830, 455 N.E.2d 817.

It is evident from the record before us that the city was faced here not only with objections from the hospital's immediate neighbors but also with a situation in which two major components of the local economy found themselves competing for a significant resource. On

one hand, the downtown retailers wanted to keep the medical offices close by in order to draw out-of-town patients into the shopping area. On the other hand, the hospital, located outside the downtown area, was having difficulty maintaining its financial viability in today's rapidly changing and highly competitive health care environment. The MOB was perceived by the hospital as one method of dealing with its problems. The hospital's solution, however, was perceived as a threat by the business community. Since both sides in this dispute were significant factors in the makeup of the community, any decision by the city was certain to spark predictions of a deleterious effect on the welfare of the whole community. Under these circumstances, we think the reasonableness of the zoning decision made by the city council was fairly debatable and must be upheld. Plaintiffs failed to show by clear and convincing evidence that the MOB special use ordinance was arbitrary, unreasonable, and devoid of a substantial relationship to the public health, safety, or welfare.

■ As a final matter regarding the validity of the challenged ordinance, plaintiffs urge us to consider the testimony of Carl Muhlenbruch which was given as an offer of proof. Muhlenbruch, an economic planning expert, testified that constructing the MOB would have an adverse effect on city revenue derived from retail sales tax generated by the central business district. He also indicated that this adverse effect would outweigh any real estate tax revenue benefit which might accrue to the city from the MOB. This testimony was excluded by the trial court on the basis that it was irrelevant. Defendants add, in their appellate brief, that the testimony was also inherently unreliable.

While plaintiffs responded to defendants' allegations that Muhlenbruch's testimony was unreliable, they have failed to present for our consideration a reasoned argument as to why the rejection of the challenged testimony by the trial court was error. They do not explain precisely what was excluded or why. They argue that economic impact is a proper consideration in determining the validity of a zoning ordinance, but fail to show how this proposition proves the trial court erred. A reviewing court is entitled to have briefs submitted that are articulate, organized, and present cohesive legal argument in conformity with supreme court rules. (*In re Marriage of Souleles* (1982), 111 Ill. App. 3d 865, 869, 444 N.E.2d 721.) Any issue which has not been adequately presented to this court for review may be deemed waived. (*Williams v. Danley Lumber Co.* (1984), 129 Ill. App. 3d 325, 472 N.E.2d 586.) Plaintiffs' argument here is not adequate to permit proper review and thus is waived.

■ Moreover, even if Muhlenbruch's testimony had been admit-

ted, we do not think it would have enabled plaintiffs' case to withstand a motion for directed verdict. Muhlenbruch predicted a tax benefit of between $15,000 and $22,000 per year and a sales tax revenue loss of approximately $30,000 to $35,000 per year. This relatively small potential monetary loss, when viewed in light of all the evidence before the trial court, does not indicate that the challenged ordinance was unreasonable and unrelated to the public welfare.

While it may be debatable whether or not plaintiffs initially made out a *prima facie* case on the issues of adequacy of the findings and constitutionality, there is no doubt whatsoever that when all the evidence is weighed, including that which favors the defendant, at least some of the evidence necessary to a *prima facie* case is negated. The trial court correctly granted defendants' motion for a directed verdict.

■■ The last assertion of error raised by plaintiffs is that the finding by the trial court that the MOB is an accessory use to the hospital is against the manifest weight of the evidence. We disagree.

It is not contested that medical office buildings, in and of themselves, are neither a permitted nor a conditional use in an RM-2 zoning district. The special use permit challenged here was issued for use of the MOB "accessory to the Hospital use." According to the city's zoning ordinance an accessory building is: "A subordinate detached building, the use of which is incidental to that of the main building or to the main use of the premises." An accessory use is defined as: "A use which is incidental to the main use of the premises."

Plaintiffs do not question that special uses, in general, may be permitted to have accessory buildings or to use their property for accessory uses. Rather, their argument is that the definitions quoted above may not be interpreted to include the subject MOB because the proposed use is neither subordinate nor incidental to the principal, or hospital, use. In support, plaintiffs cite trial testimony which indicated that most of the space in the building will be used by physicians for their private offices and private practices and that the functioning of the doctors will be essentially separate and independent from the functioning of the hospital. Plaintiffs focus heavily on evidence that, while some patients may be referred to the hospital by the doctors, most patient visits to the MOB will not involve use of the hospital. Plaintiffs also rely on the testimony of two planning experts, one their own witness and one a witness for defendants. Plaintiffs' witness testified that in his opinion an accessory use is one which serves primarily the people who are already at the main facility and is not meant chiefly to draw people who would not otherwise be there. Defendants' witness admitted on cross-examination that, during his deposition, he had essentially

agreed with the above definition of an accessory use.

While we acknowledge that this is a close case, we cannot say that the trial court's conclusion on this issue was against the manifest weight of the evidence. The ordinance defines an accessory use as "incidental" to a main use. We were called upon to interpret the word "incidental" as it was used in a zoning ordinance in *County of Lake v. La Salle National Bank* (1979), 76 Ill. App. 3d 179, 395 N.E.2d 392. In that case we cited with approval the definition of "incidental" given in *Samsa v. Heck* (1967), 13 Ohio App. 2d 94, 234 N.E.2d 312. According to the *Samsa* court an "incidental" use was anything usually connected with the principal use, something which is necessary, appertaining to, or depending upon the principal use. *County of Lake v. La Salle National Bank* (1979), 76 Ill. App. 3d 179, 181-82, 395 N.E.2d 392.

The above definition of "incidental" was applied in *Tollway North Office Center Central National Bank v. Streicher* (1980), 83 Ill. App. 3d 239, 403 N.E.2d 1246, where this court found that a food service facility was "incidental" to the functioning of an office complex even though the facility was to be privately owned and operated on a for-profit basis. This financial arrangement contrasted with that of similar food service operations in nearby office complexes where the eating facilities were offered and subsidized by the tenant companies for the benefit of their own employees. While the *Tollway North* zoning board had focused on whether the purpose of the facility was to promote a healthy relationship between each tenant company and its own employees, we recognized that the managers of a large office complex may wish to provide food service to promote a good relationship with tenants of the complex. We found no merit to the assertion that an independent, profit-making business can never be an accessory use.

Applying the foregoing definition and interpretation of "incidental" to the instant case indicates that the MOB will be an accessory use if it is something usually connected with a hospital, something necessary, appertaining to, or depending on a hospital. First of all, it is quite clear that this particular MOB would never have been proposed if the hospital had not been there. The evidence shows that the trend in medical care is to have doctors close to a hospital to the greatest extent possible. The hospital's administrator testified, and a defense exhibit demonstrated, that of the 12 hospitals within a 15-mile radius of Highland Park Hospital, all but one have an adjacent office facility. All of the hospitals with which Highland Park Hospital directly competes have at least one such facility on their campuses. This evidence was not contested by plaintiffs.

Also, several doctors testified that it is desirable for their practice

to be located adjacent to the hospital, and the hospital's administrators testified regarding the benefit to the hospital of having the doctors close by. Defendants offered unrefuted evidence that far more outpatient care is given in hospitals now than in the past. Those outpatients undergoing serious surgery or other serious procedures require closer observation by the attending physician than if they were staying in the hospital for several days. Those who are inpatients are generally more critically ill and also require closer observation. Other testimony indicated that the MOB would attract medical specialists currently not available at the hospital and help to alleviate duplication of tests and services.

It is evident that the MOB will be dependent on the hospital for any number of tests, procedures, and services which are best provided by a hospital. It is also evident that the MOB is necessary to the hospital's continued provision of high quality medical care. This is not a case where a group of doctors simply arbitrarily chose the subject property as the site for their offices. It appears far more likely that there will be a great deal of integration and interdependence between the functions of the two buildings, ultimately resulting in the perception that they are a single unit. Thus, the conclusion is inescapable that the MOB was proposed only because the hospital was already there.

Our review of the evidence persuades us that in today's health care environment, an MOB, such as the one under consideration here, is something usually connected with a hospital. The proposed MOB is something necessary, appertaining to, and depending on Highland Park Hospital. (*County of Lake v. La Salle National Bank* (1979), 76 Ill. App. 3d 179, 181-82, 359 N.E.2d 392.) Plaintiffs stress that the doctors who will ultimately be located in the MOB will be in private practice and will not be sharing with the hospital the fees received for their services. As noted above, however, in *Tollway North Office Center Central National Bank v. Streicher* (1980), 83 Ill. App. 3d 239, 403 N.E.2d 1246, we found that there was no merit in the contention that an independent, profit-making business can never be an accessory use. Accordingly, the trial court's conclusion that the MOB was an accessory use to the hospital use was not against the manifest weight of the evidence.

In accordance with the reasoning expressed above, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

DUNN and UNVERZAGT, JJ., concur.