AMERICAN NATIONAL BANK AND TRUST COMPANY, as Trustee, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee (Rubloff, Inc., Intervenor-Defendant-Appellee).

First District (2nd Division)   Nos. 1—88—3369, 1—89—0002 cons.

Opinion filed December 18, 1990.

98

99

Torshen, Schoenfield & Spreyer, Ltd., of Chicago (Jerome H. Torshen and Harold J. Winston, of counsel), for appellant.

Kelly R. Welsh, Corporation Counsel, of Chicago (Ruth M. Moscovitch and Lynn K. Mitchell, Assistant Corporation Counsel, of counsel), for appellee City of Chicago.

Frederic J. Artwick, Richard F. O'Malley, Jr., and James A. Huttenhower, all of Sidley & Austin, of Chicago, for appellee Rubloff, Inc.

JUSTICE SCARIANO delivered the opinion of the court:

American National Bank and Trust Company (plaintiff), as legal titleholder of River Center (the Center), a recently renovated building containing offices and retail outlets located at 111 North Canal Street, Chicago, appeals from several circuit court rulings in this action arising from a zoning dispute with the City of Chicago (City).

The dispute arose in July 1987 when Rubloff, Inc. (Rubloff), applied for an amendment to the City's zoning ordinance which would enable it to construct an office and retail complex at 100 North Riverside Plaza, Chicago, separated only by an alleyway from River Center. The city council unanimously approved the amendment, which became law on October 30, 1987.

According to plaintiff, Rubloff's proposed development threatens to block River Center's entire east view of the City and to interfere substantially with its ventilation system. Shortly after the amendment was enacted, plaintiff filed suit against the City seeking both injunctive relief and damages. Rubloff was given leave to intervene. In count I of its complaint, plaintiff charged that it was deprived of due process during the initial phases of the rezoning, prior to the city council vote. In count III, plaintiff complained that the arbitrary and capricious nature of the zoning amendment rendered it unconstitutional. At trial, the circuit court dismissed count III at the close of

plaintiff's case, and after hearing defendants' case on count I, entered a finding thereon in their favor. Also during trial, the court granted defendants' motion to exclude an in-court scientific demonstration and certain exhibits.

As construction continued during trial, Rubloff placed a beam alongside River Center which, according to plaintiff, began damaging its air conditioning system; consequently, in September 1988, plaintiff filed an emergency motion for a preliminary injunction and added count V to its amended complaint alleging nuisance and requesting that Rubloff be enjoined from continuing with any further work on the beam. The court denied the motion and dismissed count V. On appeal, plaintiff contends that: (1) the City failed to comply with certain guidelines for planned developments set forth in the Chicago zoning ordinance, rendering the zoning amendment invalid; (2) the City denied the plaintiff procedural due process during the rezoning proceedings, in violation of the Federal and State constitutions; (3) the zoning amendment was arbitrary, capricious, unreasonable and without substantial relation to the public welfare, thus requiring reversal of the judgment for defendants on count III; (4) the circuit court improperly denied plaintiff the opportunity to depose various city officials involved in the rezoning process; (5) the circuit court improperly excluded (a) the testimony of plaintiff's expert witness concerning an out-of-court demonstration of air quality at River Center, (b) a similar in-court demonstration, and (c) advertising brochures; and (6) it successfully stated a cause of action based on nuisance in count V, entitling plaintiff to a trial.

Plaintiff, American National Bank and Trust Company, holds title to River Center, a 19-story building housing office and retail space located at 111 North Canal Street, in Chicago's west Loop. Formerly known as the Butler Building, River Center was designed by the Burnham architectural firm in 1916 for warehouse and distribution use. Over time it became run down and neglected before the current owner purchased the building in 1980 and began a complete renovation project to convert it to its present use. At the time this dispute arose, approximately 40% of the conversion had been completed at a cost of about $15 million.

River Center extends from Randolph Street south to Washington Street and fronts on Canal Street on the west side. An 18-foot-wide city alley runs along the east side of the building, and immediately east of the alley is the railroad right-of-way of the Chicago Union Station Company with train tracks running at ground level below the street. East of the railway is a city park which fronts the west bank

of the Chicago River. The site of the Rubloff development is the space above the railroad tracks between the 18-foot alley and the City park. Before construction began, the entire east side of River Center enjoyed an unobstructed view of the City over the river.

As part of River Center's conversion project, the current owner upgraded the heating, ventilating and air conditioning system by installing new cooling towers and 600-ton chillers at ground level below the street. Fresh air intakes are located on each floor on the east side of the building. Additional air intakes which provide ventilation for River Center's lobby are located below a cantilevered driveway, adjacent to the railroad right-of-way.

In late July 1987, Rubloff filed an application for a zoning amendment to permit construction of the development which forms the subject matter of this litigation. The new building will be constructed over the railroad tracks, and its west wall will run parallel to River Center, adjacent to the 18-foot alley. The design of this new development includes a base or pedestal on the south end of the property and a 36-story tower on the north end. The base portion is as high as the roof line of River Center and will contain a parking garage with a 500- to 550-car capacity.

Plaintiff claims it will be adversely affected by the Rubloff construction in three ways. First, the new building will completely block River Center's east view. Second, by covering the train tracks, the new building will prevent fresh air from entering the Center's ground level air intakes, causing diesel fumes and other pollutants from the operation of the railroad to accumulate in the Center's lobby. Finally, the placement of a beam alongside the 18-foot alley will block fresh air from entering River Center's ground level cooling towers and force warm, moist exhaust to recirculate into the towers, causing damage to its air conditioning system.

Jared Shlaes, real estate appraiser and consultant for plaintiff, testified at trial that the loss of the Center's eastern view would cause its overall rent value to decrease by about $1.50 per square foot, resulting in an annual loss of rent of about $1.3 million. At a 10% capitalization rate, the corresponding loss of value to River Center would be $13 million, or approximately 25% of its value before the Rubloff construction. His calculations assumed that plaintiff could rent at full value the 39% of the building which was currently vacant. He also acknowledged, however, that the Center's high vacancy rate could be attributed in part to new construction and an oversupply of rental space in the downtown area.

To prevent the accumulation of diesel fumes and other pollutants in River Center's lobby, plaintiff would have to relocate the fresh air intakes which service the lobby from the basement track level to the second floor. Relocation would entail taking up to 2,000 square feet of space from a second-floor tenant, correspondingly reducing the tenant's rent, and using about 40 lineal feet of truck space to relocate the air vents. Apart from the loss of rent, physical relocation of the intakes would cost approximately $308,000. To prevent further damage to River Center's air conditioning system caused by the placement of beams, plaintiff would have to relocate its cooling towers from the basement track level to the roof of the building at an estimated cost of $700,000.

Prior to the events giving rise to this litigation, the Rubloff property, like others in the immediate vicinity, was zoned "B6-7." An office development such as Rubloff's is a permitted use under this zoning classification. But because a portion of the project was to be built over air rights, the project was required to be treated as a planned development under Chicago's zoning ordinance, and thus required an amendment to the ordinance rezoning the property (Chicago Municipal Code ch. 194A, §11.11—3(a) (1989) (hereinafter Code).) Each application for amending the ordinance is required to be reviewed by three agencies: the Chicago Plan Commission (Commission), the zoning committee of the city council (Committee), and the city council itself. Chicago Municipal Code ch. 194A, §11.11—3(a) (1989).

Before the full city council may vote on a proposed amendment to the zoning ordinance, the following procedures must be adhered to: (1) The proponent must complete an appropriate application for the amendment; (2) file it with the zoning administrator; and (3) certify to the City that it has served written notice of its intent to file an application on all owners of property within 250 feet of its own. (Chicago Municipal Code ch. 194A, §§11.9—3, 11.9—3.1 (1989).) (4) The Commission must schedule a public hearing providing "a reasonable opportunity for all interested parties to express their opinions" on the application within 60 days after its receipt; (5) give the applicant written notice of the hearing; and (6) publish a legal notice 15 to 30 days prior to the hearing. (Chicago Municipal Code ch. 194A, §11.11—3(a) (1989).) (7) The planning commissioner must submit a report and her recommendations on the application to the Commission. (Chicago Municipal Code ch. 194A, §11.11—3(a) (1989).) (8) The Commission's and the planning commissioner's reports and recommendations are forwarded to the Committee. (9) The Committee must hold its own public hearing. Chicago Municipal Code ch. 194A, §11.9—5 (1989).

The zoning ordinance further requires that, in reviewing planned development applications, the commissioner, the Commission and the city council "shall give consideration" to 13 guidelines set forth in the ordinance. (Chicago Municipal Code ch. 194A, §11.11—2 (1989).) Throughout these proceedings, plaintiff has focused on the following five of those guidelines:

"(a) *** [A]ny special regulations necessary to insure that the planned development achieves the purpose of this ordinance.

(b) The existing development *** of the subject property and adjoining areas ***.

(c) The distribution of bulk, density patterns, and intensity of use to avoid undue concentration in any portion of the subject property which would adversely affect adjoining areas.

* * *

(h) Order and harmony in structural placement and design providing accessibility to natural light, circulating air, and urban vistas free of visual pollution.

* * *

(k) The economic welfare of businesses and individuals should be respected and enhanced ***." Chicago Municipal Code ch. 194A, §11.11—2 (1989).

The following is a chronology of the events which transpired during the process of rezoning the Rubloff property to a planned development:

(1) *July 15, 1987.* Rubloff's representatives met with personnel of the Chicago Department of Planning (Department of Planning) and the Chicago Department of Public Works to discuss the proposed project.

(2) *July 28 or July 29, 1987.* Rubloff filed an application to amend the zoning ordinance.

(3) *August 12, 1987.* Rubloff had two meetings with city officials—one with Alderman Fred Roti, who represents the ward in which the property is located, and another with Department of Planning personnel who requested a design statement.

(4) *August 13, 1987.* At Rubloff's invitation, River Center's managing partner, Albert Frank, and another representative met with Rubloff's vice-president, Robert Cook, and Rubloff's lawyer. During this meeting, Rubloff gave a presentation of its new project, and River Center expressed its concerns about the impact the monolithic design would have on River Center and the project's effect on River Center's ventilation system. In response to an inquiry by Frank,

Rubloff's attorney informed him that the Commission would conduct a public hearing on the matter on September 10, 1987.

(5) *August 17, 1987.* Rubloff submitted three photographs relating to the project to the Department of Planning, one of which depicted a scale model of the Rubloff development in relation to surrounding buildings.

(6) *August 19, 1987.* Commissioner of Planning Elizabeth Hollander sent Rubloff's proposed zoning ordinance amendment to 15 or 16 city agencies for their consideration, noting that the public hearing before the Commission would be held on September 10, 1987. The agencies made no objections in their responses.

(7) *August 21, 1987.* Commissioner Hollander arranged for publication of a legal notice in the Chicago Tribune announcing that a public hearing on the Rubloff project would be held before the Commission on September 10, 1987, and sent written notice thereof to Rubloff.

River Center's counsel hand delivered a letter to the Department of Planning asking for permission to view its file on the Rubloff project. The Department is alleged to have responded that there was no file and that no meetings had been held on the matter.

(8) *Several days later.* According to plaintiff, the Department of Planning advised River Center's counsel by telephone that his request for information was refused and that the hearing would be rescheduled from September 10 to some time in October.

(9) *August 24, 1987.* Rubloff filed a one-page design statement with the City.

(10) *September 1, 1987.* Rubloff submitted a parking and traffic study to the City.

(11) *First week of September 1987.* River Center's counsel left for Labor Day vacation.

(12) *September 3, 1987.* Mark Schoenfield, a member of the law firm representing plaintiff, spoke to Mary Staniec of the Plan Commission's administrative staff, and according to Schoenfield, Staniec told him that there was no change from the October date, but stated that a check would be made.

(13) *September 4, 1987.* Also according to Schoenfield, Staniec informed him that "she had just learned that this matter had suddenly been put on the agenda for the [September] meeting that next week."

Commissioner of Planning Hollander met with her staff to discuss the Rubloff project and prepared her report to the Commission recommending approval of the proposed zoning amendment.

(14) *September 8, 1987.* River Center's counsel returned from vacation, and, complaining of the September hearing date and of being denied access to the Department of Planning's file, requested a continuance of the hearing until October.

Late in the afternoon, the Department orally informed counsel that (1) Rubloff had submitted considerable materials in connection with its application and that numerous meetings had been held; (2) the Department would make the file available September 9, the day before the hearing; and (3) a continuance would be denied.

(15) *September 9, 1987.* River Center's counsel hand delivered a letter to the Department of Planning making the same complaints he had made orally the day before, and again requested a continuance.

(16) *September 10, 1987.* The Commission conducted a public hearing on Rubloff's rezoning application. Plaintiff's counsel expressed his concerns and objections on the ground that the project would cause financial harm to the Center and complained that he was not given an adequate opportunity to prepare for the hearing. At the conclusion of the hearing, the Commission adopted the commissioner's report, unanimously approved the application and recommended passage of the amendment to the Zoning Committee.

(17) *September 11, 1987.* River Center's counsel made a written request to review the Rubloff file at the Department of Planning.

(18) *September 14, 1987.* River Center counsel reviewed the Rubloff file in the presence of a Department employee.

(19) *October 5, 1987.* River Center filed a complaint and a motion for preliminary injunction against the City, seeking to enjoin consideration of Rubloff's application by the Zoning Committee and the city council. The complaint alleged that the commissioner of planning, the Commission and the Department of Planning had failed to give adequate consideration to the application; no allegations were made that plaintiff was unable to obtain any information regarding the project from city officials.

(20) *October 6, 1987.* Rubloff intervened. The circuit court denied River Center's motion for a preliminary injunction and ultimately dismissed the complaint as moot, giving leave to plaintiff, however, to amend the complaint.

(21) *October 13, 1987.* After the Zoning Committee conducted its public hearing on Rubloff's application, it voted unanimously to approve the application and recommended that the city council pass the zoning amendment.

(22) *October 28, 1987.* The city council amended the zoning ordinance, reclassifying Rubloff's property as a planned development.

(23) *October 30, 1987*. The zoning amendment was published and became law.

After Deputy Commissioner of Planning Mosena described the Rubloff proposal at the public hearing before the Plan Commission on September 10, 1987, two Rubloff representatives made presentations using posters and other visual aids. They informed the Commission that Illinois Bell Telephone Company was negotiating with Rubloff to lease six floors of the new building, which might provide 600 new jobs to the City, and generally described various design features, including plans to improve an adjacent park and add a parking garage, which would contain 500 to 550 stalls. Representatives of two civic groups voiced support for the development.

Counsel for River Center then presented the Center's objections to the project, including concerns about diesel fumes and other pollutants entering its ventilation system. Counsel informed the Commission of the obstacles he allegedly encountered in attempting to obtain information regarding the project and claimed that no studies of the environmental effects of the new construction on River Center had been conducted. Commissioner Meyerson responded that "calculations have been done" for environmental studies; Commissioner Mosena stated that "we did receive many of the technical studies." During his presentation, River Center's counsel referred the commissioners to the above-noted guidelines for evaluating planned development applications listed in the City zoning ordinance (Chicago Municipal Code ch. 194A, §11.11—2 (1989)). As noted earlier, the Commission ultimately voted unanimously in favor of amending the zoning ordinance.

During the Zoning Committee hearing held on October 13, 1987, Rubloff's representatives again made a presentation with the same posters and other visual aids used before the Commission, and they explained that Rubloff's exhaust system would remove the diesel fumes from under the proposed building. At this hearing, Mosena testified that an environmental impact study had not been done. Mosena also stated that "[w]hile we certainly understand and have some sympathy toward the loss of [River Center's rental] space, because of loss of view, it is a process that occurs frequently since we do not have any legal basis on which to grant view protection, and any view protection that's granted must be done on a private basis between the parties." Mosena further stated that "to my knowledge, and to my staff's knowledge, there was never any discussion that this matter [the Rubloff project] would not be heard at the September meeting."

Plaintiff presented the testimony of four witnesses: River Center's counsel, the Center's primary owner, a specialist in air pollution

issues and a real estate appraiser. Members of the Zoning Committee questioned the witnesses of both sides at length, and in calling for a vote, the Committee chairman remarked that the hearing had provided "a rather exhaustive description of the project, from all sides." The Zoning Committee and city council subsequently approved the amendment.

After River Center's original complaint was dismissed on November 18, 1987, it filed an amended complaint consisting of four counts, two of which are relevant to this appeal. As noted previously, count I alleged various procedural irregularities during the rezoning process and count III alleged that the rezoning adversely affected a preexisting use in an adjoining area. During the pendency of the trial, plaintiff filed a third count relevant to this appeal, count V, charging that Rubloff's placement of a beam alongside River Center's property constituted a nuisance causing damage to its air conditioning system.

Prior to trial, plaintiff served notice to take the depositions of four city officials engaged in the rezoning process: Plan Commissioner Hollander, Deputy Commissioner Mosena, Director of Zoning Levin and Commission Chairman Robinson. The circuit court granted the City's motion to quash the notices on the grounds that they would be too burdensome and that they would impermissibly probe into the thought processes of officials acting solely in an advisory capacity to the city council. The court also quashed notices to take the depositions of the chairman of the Zoning Committee and the Committee's chief administrative officer.

Trial on counts I and III commenced on September 14, 1988, at which plaintiff presented the testimony of four witnesses: Robert Frank, the primary owner of River Center; Jared Schlaes, a real estate appraiser formerly employed by Rubloff; Jay Norco, an environmental consultant; and Kenneth Rodeck, River Center's building manager. Their testimony described the history, development and restoration of River Center, the adverse financial impact of the rezoning on the Center and the effect the Rubloff development would have on the Center's air quality and ventilation system. Fred Friedman, director of leasing operations for the River Center project, testified that there was a glut in the real estate market.

Plaintiff sought to have Norco testify about a scientific demonstration he conducted in the offices of River Center's counsel simulating the quality of air in the Center's lobby after the Rubloff construction would be completed, but the trial court excluded this proffered testimony. Plaintiff then requested the court to allow Norco to conduct the same type of demonstration in the courtroom, but the court

denied this request also on the ground that it was not "the exact or even comparably exact simulation." However, the court allowed Norco to testify that the level of nitrogen dioxide in the Center's lobby would often be high enough to produce an "acrid" and "pungent" odor. Finally, the court excluded as irrelevant certain Rubloff real estate sales brochures proffered by plaintiff to show the importance of views to prospective tenants.

In finding for Rubloff on count III at the close of plaintiff's case, the court stated that because plaintiff presented evidence concerning the impact of the Rubloff development only on River Center and not on any of the other surrounding properties, plaintiff had failed to show by clear and convincing evidence that the rezoning was arbitrary and capricious under the factors enumerated in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47.

Trial continued on count I, as to which Rubloff presented the testimony of three of its representatives, who described their presentations to the Department of Planning, the Commission and the Zoning Committee. They also testified with reference to their communications with the City and River Center. Plaintiff's counsel acknowledged at trial that "we were permitted to have our say" at the Zoning Committee hearing.

On October 14, 1988, the circuit court entered judgment for the defendants on count I. Specifically, the court found that the City had substantially complied with the zoning amendment procedures set forth in the zoning ordinance, that plaintiff had been able to fully participate in the Commission and Zoning Committee hearings and that the guidelines had been substantially considered.

On October 18, 1988, the court granted plaintiff leave to amend count V. However, on November 23, 1988, the court dismissed the amended count, finding that plaintiff failed to allege any invasion of an interest in land and that River Center was not entitled to relief because the unusual location of its cooling towers at ground level rendered it hypersensitive to Rubloff's proposed use. The court declined to rule on Rubloff's argument that count V should be dismissed because the right to the free flow of air is not a legally protectable interest in land under Illinois law.

Plaintiff filed timely notices of appeal as to all three counts.

### COUNT I

In count I of its complaint, plaintiff alleges (1) that the zoning amendment is invalid because during the rezoning process the City failed to consider certain of the guidelines for planned developments

as stipulated in the Chicago Municipal Code, chapter 194A, section 11.11—2; and (2) that the City failed to furnish plaintiff with basic fair notice and hearing requirements in violation of the due process provisions of both the Federal and State constitutions (U.S. Const. amend. XIV; Ill. Const. 1970, art. I, §2).

Rubloff contends that (1) as a home rule municipality, the City derives its zoning power directly from the Illinois Constitution and is therefore not bound by procedural mandates set forth in its own zoning ordinance, citing *Landmarks Preservation Council v. City of Chicago* (1988), 125 Ill. 2d 164; (2) even if it were bound by the guidelines, those guidelines were substantially considered and complied with during both preamendment hearings; (3) plaintiff failed to meet the threshold requirements for maintaining a due process claim; and (4) even if plaintiff had established a *prima facie* case for deprivation of due process, the facts indicate that plaintiff was actually accorded fair notice of the hearings and a meaningful opportunity to be heard on its objections.

With respect to the home rule issue, plaintiff replies that the *Landmarks* decision is not controlling in this case. In *Landmarks*, the court upheld an ordinance rescinding a building's designation as a landmark, although the rescission did not comply with an earlier ordinance which required that landmark status be withdrawn in the same manner as the original designation was made. *Landmarks* differs from the present case in that there (1) the procedures which the council followed in designating landmarks were amended concurrently with the rescinding ordinance; (2) the only plaintiff with standing did not have a cognizable property interest in the subject property; and (3) the complaint did not allege a violation of a constitutional provision.

The *Landmarks* court held: "[W]e may not hold invalid the disputed ordinance unless it was enacted in violation of a constitutional provision or a provision of a State or Federal statute." (125 Ill. 2d at 179.) Because in the present case plaintiff River Center alleged violation of its constitutional due process rights in count I, the *Landmarks* decision does not deprive the court of its power to review the validity of the rezoning ordinance under constitutional standards.

Plaintiff assumes, however, that the Plan Commission's failure to discuss the guidelines in its report means that it did not consider the guidelines. "However, where, as here, the testimony before the administrative agency is preserved for review in the record, specific findings of fact by the agency are not necessary for judicial review." (*Mahonie v. Edgar* (1985), 131 Ill. App. 3d 175, 178.) The

zoning ordinance mandates merely that the city council and its advisory bodies "consider" the guidelines; it does not require oral or written findings or any reference to the guidelines in their reports. Moreover, the record is replete with evidence that before making their recommendations, both the Commission and the Committee heard considerable testimony, received numerous exhibits, and entertained extensive argument relating to the relevant guidelines by both Rubloff and plaintiff. Therefore, we deem plaintiff's argument that the Commission did not comply with the guidelines because its report did not discuss or refer to the guidelines, *qua* guidelines, to be without warrant.

█▌█ Plaintiff also argues that it was denied due process because the Commission's report was drafted by the commissioner of planning before its hearing was held. Plaintiff contends that if the planning commissioner prepares a draft of her report before the hearing and the Commission then adopts the draft as its report after the hearing, the Commission thereby indicates its unwillingness to adopt a contrary report, however persuasive the evidence or the arguments at the hearing may be. However, a reviewing court is to presume that an agency's deliberations and other actions are fair and objective absent clear and convincing evidence to the contrary. (See *Citizens for a Better Environment v. Pollution Control Board* (1987), 152 Ill. App. 3d 105, 112 (recusal of an agency official unnecessary unless there is clear and convincing evidence that the official has an unalterably closed mind, citing U.S. Supreme Court cases).) We therefore decline to accept plaintiff's assumption and conclude that the guidelines and due process requirements were not violated when the Commission adopted a report drafted by the planning commissioner before the hearing.

█▌█ Plaintiff also claims that the rezoning process was tainted by the failure of the planning commissioner and her Department of Planning staff, and the Zoning Committee and its staff, to make any inquiries about the concerns of a known objector. However, the record discloses that at the hearing before the Commission, plaintiff's counsel argued at length with reference to the applicability of specific guidelines to the proposed project, such as the existing use of plaintiff's property, the physical and financial impact of the new development on River Center and the harm to River Center's environment; and the record of the Zoning Committee proceedings is literally studded with instances wherein plaintiff's and Rubloff's representatives gave considerable testimony and introduced numerous exhibits germane to the subject matter of the guidelines. Accordingly, we find

that the record made prior to the Committee's and the Commission's votes on the amendment, when considered with the presumption of the validity of the proceedings, reflects that the circuit court was correct in concluding that the City had substantially complied with the required procedures. See *Treadway v. City of Rockford* (1962), 24 Ill. 2d 488; *Athey v. City of Peru* (1974), 22 Ill. App. 3d 363.

Plaintiff further argues that procedural due process was violated when the Plan Commission erred as to matters of fact and of law. Plaintiff refers to Acting Commission Chairman Meyerson's mistaken statement that "calculations have been done" on environmental impact. We note, though, that Commissioner Mosena later testified at the Zoning Committee hearing that an environmental impact study was not done. Plaintiff also maintains that the Plan Commission and Zoning Committee erred as to a matter of law when Mosena stated at the Zoning Committee hearing that the Plan Commission does "not have any legal basis on which to grant view protection *** [s]o, we did not, in reviewing the case, find any exception [*sic*] environmental matters which required a special environmental study." Plaintiff argues that this statement is inconsistent with the guidelines' statement that the Commission must consider "urban vistas free of visual pollution." (Chicago Municipal Code, ch. 194A, §11.11–2(h) (1989).) Plaintiff fails to cite any authority to support the conclusion that the alleged mistake of law by the deputy commissioner taints the decision of the entire Commission. Assuming, *arguendo*, that Mosena misperceived the law, there is no indication in the record that Mosena communicated this misperception to other commissioners, or, if he did, that the members of the planning or zoning bodies relied upon this statement. More important, we fail to apprehend what possible prejudice plaintiff was subjected to by these statements or alleged misperceptions in light of the voluminous testimony and exhibits received by both advisory bodies, and the argument made by plaintiff before both the Commission and the Committee—information which covered profusely its side of the controverted issues concerning the proposed development, especially in relation to the guidelines. See *Zenith Vending Corp. v. Village of Schaumburg* (1989), 180 Ill. App. 3d 354.

It is noteworthy to point out here that although plaintiff admits that the Zoning Committee "heard testimony *** relating to the Guidelines," it argues that the alleged misstatement by Mosena prevented the Committee from "properly considering them." We quite agree with Rubloff that there can be a reasonable difference of opinion as to whether the "visual pollution" to which guideline (h) refers was intended to prevent a landowner from erecting a new office

building merely because it would block an adjacent building's view of an attractive landscape, such as a river front.

■■ Plaintiff goes on to argue that it did not receive adequate notice of the Plan Commission hearing due to some confusion over the Commission's scheduling of the hearing date and did not receive a copy of the file until a day before the hearing; thus, it claims to have been deprived of its right to procedural due process in that it did not have a meaningful opportunity to participate in that hearing. Plaintiff's argument is not persuasive, for a review of the record shows that both the City and Rubloff complied with all of the procedural requirements set forth in the zoning ordinance. (See Chicago Municipal Code ch. 194A, §§11.9–3, 11.9–3.1, 11.9–5, 11.11–3(a) (1989).) Specifically, Rubloff gave the required notice of the public hearing to plaintiff, the Commission scheduled the hearing within 60 days after receiving Rubloff's amendment application, caused a legal notice of the hearing date to be published in the Chicago Tribune, and provided "a reasonable opportunity for all interested parties to express their opinion." Further, the record reflects conflicting testimony as to whether plaintiff was misinformed about the date of the hearing.

■■ With respect to plaintiff's allegation of losing a meaningful opportunity to be heard as a result of the alleged mix-up over the hearing date, plaintiff cannot dispute that it had ample opportunity to present its objections to both the Commission and the Zoning Committee. Although plaintiff contends that its counsel was so poorly informed that he could merely ask questions at the Commission hearing, the record reflects that his participation consisted of much more, including an abundance of vigorous argument against the amendment, both as to the facts and the law, all with special reference to the guidelines.

■■ Plaintiff also fails to demonstrate any prejudice as a result of its not being able to obtain any material from the Plan Commission until a day before the hearing; nor does it refer to any evidence which it was prevented from introducing or to any arguments it would have presented to the Commission had its counsel been better informed, or if he had been at least as well informed as he was before the Committee. The record reflects that on August 13, 1987, four weeks before the Commission hearing, plaintiff and Rubloff met, and River Center expressed its concern over the project's effect on River Center's air intakes and that the "huge monolithic block" design would severely impact on River Center. Thus plaintiff appears to have been informed of the impact of the project well before the Plan Commission hearing; moreover, it appears to have been able to overcome whatever short-

comings there might have been in its presentation before the Commission through its presentation before the Zoning Committee, for which it had over a month to prepare. Indeed, plaintiff's counsel admitted to the trial court that plaintiff's representatives "were permitted to have [their] say" before the Zoning Committee.

Accordingly, we agree with the circuit court that the Commission, the Committee and the city council substantially complied with procedural due process requirements and the City's guidelines, and that the plaintiff's representatives "had an opportunity to be heard and did present their position before the Plan Commission and the Zoning Committee." Accordingly, for the foregoing reasons, the circuit court's judgment in favor of defendants on count I is affirmed.

### DISCOVERY

Plaintiff complains that its inability to take the depositions of six city officials who participated in the rezoning of Rubloff's property unduly impaired its preparation for trial. Plaintiff avers that it sought the testimony for the purpose of ascertaining to what extent the *conduct* of the officials comported with the procedural requirements set forth in the zoning ordinance; or as plaintiff argued to the trial judge, "I'm not interested in their reasoning. I'm interested in what they did." The City argued that the depositions would impose an undue burden on the officials since the information could be obtained through alternate forms of discovery. The trial judge agreed with the City.

Plaintiff maintains that as long as a witness has personal knowledge of relevant events, his status as an official should not prevent his being deposed, citing *Alliance to End Repression v. Rochford* (N.D. Ill. 1976), 75 F.R.D. 428, ordering the deposition of Richard J. Daley, mayor of Chicago. However, *Alliance* is distinguishable because there, plaintiff sought to depose someone who had allegedly participated in illegal activity, and the court found not only that Mayor Daley was hostile to the plaintiffs' suit, but that "[a]ll interrogatories directed to defendant Daley were objected to on grounds which could have been mooted by defendant Daley's own reasonable cooperation. Defendants have indicated no willingness to cooperate in discovery matters in order to move this litigation forward; and surely counsel for defendant Daley cannot seriously suggest that the Court order a method of discovery which would produce an endless stream of objections for resolution. The Court will not put plaintiffs to that burden." (*Alliance*, 75 F.R.D. at 429.) The case *sub judice* does not present us with anywhere near the situation with which the court was confronted

in *Alliance*. Further, plaintiff's contention that it was denied due process in this context is essentially no different than the assertion it makes in connection with count I; hence, it merits no different consideration here. "Plaintiffs have not made the requisite showing that [the commissioners'] deposition is necessary in order to prevent injustice. They have not shown that the information they seek is not available *** through interrogatories or other discovery devices." (*Cornejo v. Landon* (N.D. Ill. 1981), 524 F. Supp. 118, 122.) Moreover, plaintiff engaged in what appears to be extensive demands for discovery in the form of interrogatories, production of documents and requests for admissions, with all of which the City complied; and the record does not disclose that plaintiff pursued any remedial measures based upon any alleged lack of cooperation on the part of the City.

### COUNT III

Plaintiff asserts that the circuit court's judgment in favor of defendants on count III is contrary to the manifest weight of the evidence and should therefore be reversed. (See *Copley Memorial Hospital, Inc. v. City of Aurora* (1981), 99 Ill. App. 3d 217, 220.) In count III, plaintiff, in pleading a substantive due process claim, alleged that the rezoning amendment was arbitrary and capricious and that its harm to River Center substantially outweighed any public benefit. At the close of plaintiff's case, the circuit court entered a finding that plaintiff failed to substantiate these claims by clear and convincing evidence.

Plaintiff contends that the rezoning is unreasonable because (1) it will permit acrid and pungent fumes from diesel trains to enter River Center's ventilation system thereby forcing plaintiff to relocate its lobby air intakes at a cost of $308,000 and will adversely affect plaintiff's ability to attract and maintain tenants; and (2) it will destroy River Center's east view, causing an annual loss of $1.3 million in rents and a corresponding $13 million reduction in the value of its property. Without contesting that River Center may suffer injury as a result of the rezoning, defendant Rubloff maintains that plaintiff failed to present the trial judge with sufficient evidence to establish a *prima facie* case of unreasonableness.

"It is always presumed, in an attack upon an ordinance, that the enactment is valid, and the burden of proving its invalidity falls upon the one who attacks the ordinance. [Citation.] Before a court will intervene it must be established by clear and convincing evidence that the ordinance, as applied to plaintiffs, is arbitrary and unreasonable and has no substantial relation to the public health, safety

or welfare." (*La Salle National Bank v. City of Evanston* (1974), 57 Ill. 2d 415, 428.) "These rules are based upon a recognition that zoning is primarily a legislative function ***" and "[w]here it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a [zoning] classification, the legislative judgment must be conclusive." (57 Ill. 2d at 428.) "A motion [to find for defendant in a trial before the court sitting without a jury] should be granted only when all of the evidence, when viewed in its aspect most favorable to the opponent of the motion, so overwhelmingly favors the movant that no contrary verdict could ever stand." *Morris v. City of Chicago* (1985), 130 Ill. App. 3d 740, 743.

■■ The Illinois Supreme Court has identified eight factors which a court should consider in evaluating the reasonableness of an ordinance:

1. The existing uses and zoning of nearby property;

2. The extent to which property values are diminished by the particular zoning restrictions;

3. The extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public;

4. The relative gain to the public as compared to the hardship imposed upon the individual property owner;

5. The suitability of the subject property for the zoned purposes; and

6. The length of time the property has been vacant as zoned considered in the context of land development in the vicinity of the subject property. *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47.

7. The community need for the proposed use; and

8. The care with which the community has undertaken to plan its land use development. *Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 378.

The parties agree that the foregoing *La Salle* and *Sinclair* factors apply to the instant case. Rubloff maintains that plaintiff's evidence on count III either favored the rezoning in terms of the *La Salle* and *Sinclair* factors or showed that plaintiff alone, rather than all property owners in the vicinity, might suffer adverse effects from the Rubloff development. Plaintiff's witnesses testified at trial that there was a real estate glut in the area of the project, and thus, arguably, the project could harm the whole community.

■■ The *La Salle* and *Sinclair* factors enumerated above clearly contemplate a balancing of the benefits and detriments of the zoning

with respect to the needs of the entire community surrounding the subject property. Although Rubloff argues that the amendment to the zoning ordinance harms only the plaintiff in this case, this factor should not be conclusive; more determinative is the fact that in the excerpts which the court had before it of the record made before the council voted on the project and which related to count III, the court had sufficient evidence before it to enable it to determine that there was substantial benefit to be derived from the project, which the judge found to outweigh the harm caused to plaintiff from the amendment to the zoning ordinance. For example, there was testimony that the west Loop was the area of highest growth in Chicago, that the project would provide much needed parking space and park improvements, and would also bring a number of new jobs to the City. Therefore, in light of the supreme court's holding that "[w]here it appears, from all the facts, that room exists for a difference of opinion concerning the reasonableness of a [zoning] classification, the legislative judgment must be conclusive" (La Salle, 57 Ill. 2d at 428), the trial court's judgment in the instant case cannot be held to be arbitrary or capricious. La Salle, 12 Ill. 2d at 46.

Furthermore, the cases that plaintiff cites are easily distinguishable. For example, plaintiff cites National Bank v. County of Will (1987), 151 Ill. App. 3d 957, for the proposition that the case should be remanded to the trial court for the purpose of considering its substantive due process claim. In National Bank, the county had passed an amendment to a zoning ordinance forbidding further development of residential units, thus, in effect, maintaining the community as an agricultural one. (151 Ill. App. 3d at 961-62.) But the plaintiff in National Bank was held to have established a prima facie case of a denial of substantive due process, unlike the situation we have here, where plaintiff has failed to meet its burden of proving by clear and convincing evidence that the benefits developed before the Commission and the Committee could not rationally be considered to be outweighed by the harm that River Center would allegedly encounter.

Malman v. Village of Lincolnwood is also distinguishable. (Malman v. Village of Lincolnwood (1965), 61 Ill. App. 2d 55.) In Malman, although it is true that defendant "did not introduce any evidence to controvert that of the plaintiffs" (61 Ill. App. 2d at 63), here, it was unnecessary for defendants to put on any evidence because there was substantial evidence in the record of benefits to the community to be derived from the project, and, more important, plaintiff had not established a prima facie case. Michigan-Lake Building Corp. v. Hamilton (1930), 340 Ill. 284, 298, also cited by plaintiff,

is inapplicable because there, unlike in the instant case, there was "not a word in the record pertaining to the necessity of the amendatory ordinance or to its benefit to the public welfare in any manner."

Accordingly, the holding in favor of the defendant on count III should be affirmed.

### DEMONSTRATION AND EXHIBITS

Plaintiff alleges that it should be granted a new trial because the circuit court abused its discretion in not allowing it to explain an experiment or to permit a demonstration involving the release of nitrogen dioxide into the courtroom. The plaintiff sought to establish that the odor from the release of a canister of nitrogen dioxide in the courtroom would simulate how that gas would accumulate in River Center's lobby as a result of Rubloff's project. The trial court concluded that the conditions of the experiment and demonstration were not substantially similar to those that would exist in plaintiff's lobby, and therefore, excluded them.

Plaintiff relies upon *Rust v. Guinn* (Ind. App. 1981), 429 N.E.2d 299, 305-06, to support the admissibility of the evidence. In *Rust*, a jar of chicken manure was passed among the jury to demonstrate the effect of the smell of a chicken farm upon the people of an adjacent residence. There, the court held that it was not an abuse of discretion to allow the demonstration at trial. (429 N.E.2d at 305-06.) However, since plaintiff's expert, Norco, described the potential odor in the lobby as "pungent" and "acrid," we fail to apprehend how plaintiff's inability to further describe it by explaining an experiment or by means of an in-court demonstration was an abuse of the trial court's broad discretion in these matters. See *Cole v. Guy* (1989), 183 Ill. App. 3d 768, 777.

Plaintiff further complains of the court's excluding as irrelevant the introduction of certain real estate brochures that would demonstrate that developers consider a building's view to be a useful factor in marketing a building to prospective tenants. Assuming, without deciding, that the chancellor's ruling was in error, we fail to perceive that it could be anything more than harmless. *Smith v. Smith* (1930), 340 Ill. 373; *Newman v. Youngblood* (1946), 394 Ill. 617.

### COUNT V

Plaintiff alleges in count V of its complaint that River Center's interest in the use and enjoyment of its land has been unreasonably invaded by Rubloff's placement of concrete beams that deflect warm, humid air back into the Center's cooling towers, which impedes the

functioning of the Center's air conditioning system. Citing a number of out-of-State authorities, e.g., *Prah v. Maretti* (1982), 108 Wis. 2d 223, 321 N.W.2d 182, 191, plaintiff alleges that the modern trend in private nuisance law is toward recognizing that a deprivation of light and air obstructs the right to freely use one's land without annoyance.

■■ ■ In reviewing the trial court's decision to dismiss count V for failure to state a cause of action, "we must accept as true all well-pleaded facts and all inferences which can be reasonably drawn from those facts" (*Szajna v. General Motors Corp.* (1986), 115 Ill. 2d 294, 298), and consider whether the circuit court erred, as a matter of law, in not recognizing a right to the free flow of air. We need not consider plaintiff's out-of-State authorities because there is Illinois Supreme Court case law which controls. In *People ex rel. Hoogasian v. Sears, Roebuck & Co.* (1972), 52 Ill. 2d 301, defendant was held not to have created a nuisance, and thus would not be enjoined from continuing to build a 110-story office building which interfered with television reception in surrounding areas. The supreme court held in *Hoogasian* that there is " 'no legal right to the free flow of light and air from the adjoining land, *** even though [a new building] causes injury to another by cutting off the light and air and interfering with the view that would otherwise be available over adjoining land in its natural state.' " *Hoogasian*, 52 Ill. 2d at 304, quoting *Fontainebleau Hotel Corp. v. Forty-Five Twenty-Five, Inc.* (Fla. Dist. Ct. App. 1959), 114 So. 2d 357. See also *Cain v. American National Bank & Trust Co.* (1975), 26 Ill. App. 3d 574.

■ Plaintiff attempts to distinguish *Hoogasian* by arguing that the guidelines expand plaintiff's protectable property interests under nuisance law and that "interference with fresh air for air conditioning is at issue, not merely interference with television reception." Whether or not plaintiff's right to maintain its present system of air conditioning is inherently more valuable than the right to television reception, as plaintiff contends, neither Illinois law relating to nuisances nor the guidelines recognize any right to the free flow of air. The guidelines merely require the Commission and the city council to *consider* "providing accessibility to natural light [and] circulating air." (Chicago Municipal Code ch. 194A, §11.11—2 (1989).) Plaintiff does not point to any authority in support of its contention that the city council intended to expand property rights under the rubric of nuisance law when it enacted the guidelines. Because we find that *Hoogasian* controls, we need not determine whether, as Rubloff contends and the trial court held, plaintiff was hypersensitive to construction on adjoining property.

Finally, plaintiff contends on appeal that even if its nuisance claim fails, defendant may still be liable in damages for negligence. Specifically, plaintiff alleges in its brief that "[e]ven assuming, *arguendo*, that an extra-sensitive use might be involved, 'if the defendant is aware of plaintiff's extra-sensitive use he may be liable for negligence, although not for nuisance'" (quoting W. Keeton, *Prosser & Keeton on Torts* §88, at 628 n.23 (5th ed. 1984)). However, we need not address this claim, for it was not adequately alleged in the plaintiff's complaint. (*Belmar Drive-In Theatre Co. v. Illinois State Toll Highway Comm'n* (1966), 34 Ill. 2d 544, 548.) Therefore, we hold that the circuit court correctly held that plaintiff failed to state a cause of action as to count V.

Accordingly, we affirm the judgments of the circuit court.

Affirmed.

DiVITO, P.J., and BILANDIC,* J., concur.

---

*Judge Bilandic participated in the decision of this case prior to taking office as a supreme court judge.